# EXHIBIT B

# SETTLEMENT AGREEMENT AND MUTUAL RELEASE

1/3/2025

This SETTLEMENT AGREEMENT AND MUTUAL RELEASE, ("**Agreement**") dated ~~December ___, 2024~~ between P & I Insurance Services, LLC ("**Plaintiff**") and Donald Blizzard ("**Defendant**" or "Blizzard") Plaintiff and Defendant shall each be referred to as a "Party" and collectively as the "**Parties**".

## WITNESSETH:

WHEREAS, Defendant worked for Plaintiff as an insurance producer beginning in November 2009 through his termination of employment on or about January 17, 2019.

WHEREAS, "Producers" are employees who are licensed to sell insurance and must hold a producer license for the line of policies that they sell, such as casualty or property insurance.

WHEREAS, on or about January 3, 2011, Defendant and Plaintiff executed a document entitled "Plaintiff Insurance Services, LLC — Producer Agreement" ("Producer Agreement"), in exchange for Defendant's right to receive a split of commissions which he was previously ineligible to receive.

WHEREAS, after signing the Producer Agreement, Defendant became eligible to receive, and did receive, a much greater income than he was previously being paid.

WHEREAS, as an employee of Plaintiff, Defendant had access to Plaintiff's valuable confidential, proprietary and trade secret information and was under a duty to keep such information confidential during and after his employment. Among other items, such information included the identity of Plaintiff's clients, the clients' financial information, and details of their policies such as renewal dates and premiums. Such information also included Plaintiff's marketing plans. As a producer, Defendant had a high level of interaction with Plaintiff's clients and potential clients.

WHEREAS, the Producer Agreement imposed confidentiality and non-disclosure obligations on Defendant as well as restricted Defendant's post-employment activities. These restrictive covenants included prohibiting Defendant from notifying or allowing notice to any of his commission accounts that he is no longer affiliated with Plaintiff or affiliated with a direct or indirect competitor for a period of 36 months after termination of the Producer Agreement; prohibiting Defendant from soliciting or sharing any information regarding Plaintiff's accounts with any other person or firm for a period of 36 months after termination of the Producer Agreement; prohibiting Defendant from directly or indirectly soliciting any of Plaintiff's past, present or future clients that were then under solicitation by Plaintiff for a period of three (3) years after termination of the Producer Agreement; and prohibiting Defendant from divulging, disclosing or communicating to any third party, without Plaintiff's written consent, Plaintiff's proprietary and confidential information, including customer lists, business affairs, process

information, procedures, forms and records, organizational files and all aspects of Plaintiff's business which constitute confidential and business information for a period of ten (10) years after termination of the Producer Agreement.

WHEREAS, Defendant was a fiduciary of Plaintiff, having been entrusted with confidential client and trade secret information pursuant to the Producer Agreement.

WHEREAS, in late March 2018, a long simmering dispute between Defendant and other Plaintiff personnel erupted into a hostile meeting that involved swearing and name calling. Defendant left the meeting angry and upset.

WHEREAS, following the meeting, Defendant decided that he would leave Plaintiff and join a competing insurance agency.

WHEREAS, by early April, Defendant was communicating with William Sprague ("Sprague"), a principal of Risk Averse Insurance ("Risk Averse"), which is a direct competitor of Plaintiff, regarding the possibility of leaving Plaintiff and joining Risk Averse as a producer. Defendant thereafter met with Sprague and another principal of Risk Averse to discuss his plans to leave Plaintiff.

WHEREAS, by May 2018, Defendant began referring potential and existing Plaintiff clients to Risk Averse in contravention of the Producer Agreement, Defendant's fiduciary obligations and Plaintiff's policies.

WHEREAS, in July 2018, Plaintiff's principal organized an informal mediation between the parties to the long-running dispute to try to restore peace and productivity in the office. Defendant, Plaintiff's principal, another Plaintiff team member involved in the dispute and a mediator met to discuss the issue. Leading up to, during meeting and shortly after the meeting, Defendant made various representations to Plaintiff's principal that Defendant intended to continue working at Plaintiff in the future and would use his best efforts to continue to procure insurance business on Plaintiff's behalf. For example, during this time, Defendant represented that he was "in it [(referring to employment with Plaintiff)] for the long term." Plaintiff also offered to increase his commissions on certain accounts in exchange for his ongoing commitment to Plaintiff. In response, Blizzard indicated that Plaintiff's principal should "sit back and watch" him procure new accounts for Plaintiff's benefit.

WHEREAS, in September and November of 2018, Defendant continued to emphasize to Plaintiff's principal that he intended to use his best efforts to procure insurance business for Plaintiff.

WHEREAS, at the time Defendant made these representations, he knew them to be false but made them anyway because he had yet to secure alternative employment. He also requested and received a change in commission structure that resulted in him receiving additional compensation.

WHEREAS, in December 2018, Plaintiff learned that Defendant had made an error on an account, creating the potential for significant liability for Plaintiff. Defendant was placed on paid leave and directed not to seek new business or interact with Plaintiff's clients or prospects. Defendant acknowledged these limitations and represented that he would abide by them.

WHEREAS, when Defendant confirmed to Plaintiff's principal that he would not perform work on Plaintiff's clients' or prospective clients' accounts, he knew those statements were false.

WHEREAS, in December 2018, Defendant explicitly confirmed with Sprague that he intended to leave Plaintiff and work for Risk Averse.

WHEREAS, while still employed by Plaintiff, and contrary to Defendant's confirmation that he would not perform work on Plaintiff's clients' and prospective clients' accounts, Defendant began referring prospective and existing Plaintiff clients to Risk Averse. He also began providing Sprague with Plaintiff's confidential trade secret information, including Plaintiff's customer information, information on customer policies, premium amounts and renewal dates. He accessed Plaintiff's systems to take information that he could, and did, pass to Sprague to facilitate the transfer of a large Plaintiff client.

WHEREAS, while subject to the Producer Agreement, Defendant misappropriated Plaintiff's assets in the form of money and intellectual property, and other protected trade secrets, through false pretenses, false representations and/or actual fraud.

WHEREAS, in addition, Defendant made false and misleading statements to Plaintiff by concealing his intention and actions to misappropriate confidential client and trade secret information to divert Plaintiff's clients for his own benefit and that of his subsequent employer.

WHEREAS, Defendant contacted Plaintiff's clients for the purpose of soliciting their business for his personal benefit and that of Risk Averse while knowing that he was prohibited from doing so under the Producer Agreement.

WHEREAS, Defendant made false and misleading statements to Plaintiff by concealing his intention and actions to misappropriate confidential client and trade secret information to divert Plaintiff's clients for his own benefit and that of his subsequent employer.

WHEREAS, Defendant contacted Plaintiff's clients for the purpose of soliciting their business for his personal benefit and that of Risk Averse while knowing that he was prohibited from doing so under the Producer Agreement.

WHEREAS, Plaintiff relied on the false and misleading representations made by Defendant during his employment and permitted access to confidential client and trade secret information.

WHEREAS, Defendant made the false and misleading representations to Plaintiff knowing them to be false and with the intent and purpose of deceiving Plaintiff.

WHEREAS, on January 17, 2019, Plaintiff terminated Defendant's employment.

WHEREAS, within a matter of days after termination, Plaintiff learned that Defendant was working for Risk Averse in a substantially similar position as he had with Plaintiff and was actively contacting Plaintiff's clients through the business networking service known as Linkedln.

WHEREAS, after termination of Defendant's employment with Plaintiff, Defendant continued to actively solicit Plaintiff's clients on behalf of Risk Averse in violation of his Producer Agreement and by using confidential and proprietary information and trade secrets of Plaintiff without authorization.

WHEREAS, after termination of his employment, Defendant refused to return his company laptop and phone despite Plaintiff's demands that he do so. Upon information and belief, the company laptop contained or contains Plaintiff's confidential and proprietary information and trade secrets.

WHEREAS, on or about January 24, 2022, Plaintiff commenced AAA arbitration action 01-22-0000-3380 (the "Arbitration Action") against Defendant for Violation of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836, et seq.); Violation of the Pennsylvania Uniform Trade Secrets Act (12 Pa. C.S. § 5301, et seq.); Breach of Contract; Tortious Interference; Unfair Competition; and Unjust Enrichment.

WHEREAS, after a multiday evidentiary hearing, the arbitrator, on November 10, 2022, found in favor of Plaintiff on all five counts of the Arbitration Action Complaint and awarded Plaintiff lost profits in the amount of $537,370.00, plus exemplary damages in the amount of $1,074,740.00, totaling $1,612,110.00 (the "Award").

WHEREAS, the Award was confirmed by the United States District Court for the Eastern District of Pennsylvania.

WHEREAS, Plaintiff has docketed the Award in the Court of Common Pleas of Delaware County, at Docket No. CV-2023-003999 (the "PA Action") and in the Superior Court of New Jersey, at Docket No. MER-DJ-050181-23 (the "NJ Action").

WHEREAS, the Superior Court of New Jersey issued an Order in the NJ Action, dated July 21, 2023, ("Charging Order") charging Defendant's interest in Global Interxchange LLC ("GIX") and requiring GIX pay all economic benefits associated with the Blizzard's interest in GIX to Plaintiff.

WHEREAS, Defendant filed a petition commencing a Chapter 13 bankruptcy case in the United States Bankruptcy Court for the Eastern District of Pennsylvania, docketed as 23-12669-amc (the "Chapter 13 Case").

WHEREAS, Plaintiff initiated an adversary proceeding in the Chapter 13 Case, *P&I Insurance Services, LLC vs. Donald F. Blizzard*, docketed as 24-00093-amc (the "Adversary Proceeding").

WHEREAS, in response to the Chapter 13 Trustee's Motion to Dismiss for, *inter* alia, Defendant's failure to make timely trustee payments and delay in confirming a plan, the Bankruptcy Court entered an order on August 2, 2024 dismissing the Chapter 13 Case. As a result of the dismissal of the Chapter 13 Case, the Bankruptcy Court later dismissed the Adversary Proceeding on jurisdictional grounds.

WHEREAS, Defendant owns a condominium located at 838 B Putnam Blvd., Wallingford, PA 19086 (the "Condominium").

WHEREAS, the Condominium is currently listed for sale through Kim Seaman of Coldwell Banker Realty.

WHEREAS, Plaintiff has issued discovery in aid of Execution directed to both Defendant and various third parties in the PA Action.

WHEREAS, the Parties wish to resolve all outstanding issues related to the Award, the PA Action, and NJ Action.

NOW THEREFORE, in consideration of the forgoing and other good and valuable consideration, and intending to be legally bound, the Parties do mutually covenant, promise and agree as follows:

1. **Recitals.** The above recitals form a part of this Agreement. Defendant hereby represents, acknowledges and confirms that each of the above recitals is true and correct.

2. **Effective Date.** This Agreement shall be binding on the Parties on the first date upon which all the following conditions have been satisfied (the "Effective Date"): (a) each of the Parties has executed this Agreement; (b) the Defendant has made the payment specified in Section 3(a) of this Agreement; and (c) Defendant has fully complied with his obligations in Section 7 of this Agreement, including the obligation to transfer the GIX Interest to Plaintiff.

3. **Payment to Plaintiff.** Defendant shall pay Plaintiff One Hundred Fifty Thousand Dollars ($150,000.00) ("Cash Component") plus all amounts due pursuant to Section 4 of this Agreement plus transfer of the GIX Interest in according with Section 7 of this Agreement ("Settlement Sum"). Plaintiff shall pay the Cash Component of the Settlement Sum as follows:

a. Twenty Thousand Dollars ($20,000.00) upon the execution of this Agreement;

b. One Hundred Thirty Thousand Dollars ($130,000.00) ("Deferred Amount") as follows:

i If the Condominium is sold on or before January 31, 2025, and the proceeds of the sale are equal to or exceed the Deferred Amount, then upon the sale of the Condominium defendant shall pay Plaintiff the entire proceeds of the sale of the Condominium;

ii If the Condominium is sold on or before January 31, 2025, and the proceeds of the sale are less than the Deferred Amount, then:

1 All the proceeds of the sale of the Condominium shall be paid to Plaintiff upon the sale of the Condominium and applied to the Deferred Amount;

2 Defendant shall make monthly payments of Three Thousand Dollars ($3,000.00) per month beginning on the first day of the month immediately following the sale of the Condominium and continuing on the first day of each month thereafter until April 1, 2025, with such payments being applied to the Deferred Amount; and

3 The unpaid balance of the Deferred Amount shall be paid on or before April 30, 2025.

iii If the Condominium is not sold by January 31, 2025, then:

1 Defendant shall make monthly payments of Three Thousand Dollars ($3,000.00) per month beginning February 1, 2025, and on the first day of each month thereafter until April 1, 2025, with such payments applied to the Deferred Amount;

and

2 The Defendant shall pay the remaining unpaid balance of the Deferred Amount on or before April 30, 2025, or upon the sale of the Condominium, whichever is sooner

4. **Proceeds from Condominium Sale.** Notwithstanding anything to the contrary, should the proceeds of the sale of the Condominium exceed the balance of the Deferred Amount, Defendant shall pay the entirety of the proceeds of the sale to Plaintiff.

5. **Manner of Payment.** All payments to Plaintiff shall be made by either a cashier's or certified check made payable to "P&I Insurance Services, LLC" or via wire transfer according to the wire instructions attached hereto as Exhibit A.

6. **Best Efforts to Sell Condominium.** Defendant shall use his best efforts to sell the Condominium to a third-party purchaser in an arm's length transaction and to maximize the amount received for the Condominium. Defendant shall provide copies of all offers received from potential purchasers of the Condominium within twenty-four (24) hours of receiving such offer. Defendant shall immediately notify Plaintiff when the Condominium is under agreement to be sold.

7. **Transfer of GIX Interest.** Immediately upon the execution of this Agreement, Defendant shall convey the entirety of his interest in Global Interxchange LLC ("GIX" or the "**GIX Interest**") free and clear of any liens or encumbrances to Plaintiff by executing an assignment of interest in the form attached hereto as Exhibit B. The Parties acknowledge that the GIX Operating Agreement or other documents impose restrictions on the transfer of the GIX Interest and that the transfer of the GIX Interest to Plaintiff must be approved by GIX. Defendant agrees to request that GIX approve the transfer of the GIX Interest to Plaintiff and agrees to cooperate in and use his best efforts to facilitate the transfer of the GIX Interest to Plaintiff. In the event GIX fails to approve the transfer of the GIX Interest to Plaintiff, then Defendant agrees (1) not to contest, appeal or seek to vacate or modify the Charging Order and (2) to immediately convey upon receipt any financial benefit received or derived from his ownership of the GIX Interest. Defendant represents and warrants that he is the sole owner the GIX Interest and he has never transferred, conveyed, assigned or encumbered it. Defendant represents and warrants that the GIX Interest consists of 100,000 shares of GIX. The Parties understand and agree that the

value of the GIX Interest is highly speculative. For the purposes of this Agreement, the Parties stipulate that the value of the GIX Interest is $10,000.00.

8. **Stay of Execution.** Provided Defendant is not in breach of this Agreement, Plaintiff shall stay any post-judgment execution discovery against Defendant and any third parties.

9. **Release of Plaintiff.** Upon execution of this Agreement, Defendant does hereby release, remise, quitclaim and forever discharge Plaintiff, its parents and subsidiaries, its owners, officers, employees, agents and attorneys, including Andrew Porter and Danial Mclaughlin, from all past, present and future claims, claims for attorney's fees, suits, debts, contracts, demands, obligations, liens, damages, costs, expenses, compensation of any nature whatsoever, and causes of action, which Defendant may have or now has from the beginning of the world to the Effective Date. Nothing contained herein, however, shall prevent Defendant from enforcing the terms of this Agreement.

10. **Release of Defendant.** In consideration of the agreements contained herein, and effective on the 91st day after the Defendant pays the entirety of the Settlement Sum in accordance with, and at the times specified in, Sections 3, 4 and 7 of the Agreement without (a) Defendant filing a petition commencing a bankruptcy case or proceeding or (b) an insolvency petition having been filed against Defendant, Plaintiff does hereby release, remise, quitclaim and forever discharge Defendant, his heirs, executors, administrators, successors, assigns, agents and attorneys from all past, present and future claims, claims for attorney's fees, suits, debts, contracts, demands, obligations, liens, damages, costs, expenses, compensation of any nature whatsoever, and causes of action, pertaining to the Award and any specific issue(s) raised therein, which Plaintiff may have or now has from the beginning of the world to the Effective Date. Nothing contained herein, however, shall prevent Plaintiff from enforcing the terms of this Agreement, or any other action or cause of action not set forth in the Action.

11. **Preservation of Claims.** It is specifically agreed by and between the Parties that the Award, PA Action and NJ Action and all judgments in favor of Plaintiff and against Defendant are preserved in full until the 91st day after Defendant pays the Settlement Sum in accordance with, and at the times specified in, Sections 3, 4 and 7 without (a) Defendant filing a petition commencing a bankruptcy case or proceeding or (b) an insolvency petition having been filed against Defendant. If any claim is ever made upon Plaintiff for the repayment or return of any part of the Settlement Sum, then in such event the release given by Plaintiff to the Defendant herein shall be automatically null and void and the Parties shall be returned to their pre-Agreement positions, except that Plaintiff may retain any portion of the Settlement Sum not repaid or returned, crediting same against those sums claimed by Plaintiff. The Parties specifically agree that this Agreement does not create a new obligation upon Defendant, and that Plaintiff preserves its right to assert the nondischargeable nature of the debt owed by the

Defendant pursuant to the Award, PA Action and NJ Action and judgments obtained pursuant to the Award in the event of a bankruptcy filing.

12. **Termination of Judgments.** If Defendant timely performs his obligations pursuant to Sections 3, 4, 5 and 7 of this Agreement, Plaintiff shall the mark the judgments entered in the United States District Court for the Eastern District of Pennsylvania, the Court of Common Pleas of Delaware County, and the Superior Court of New Jersey satisfied. If Defendant does not timely perform his obligations pursuant to Sections 3, 4, 5 and 7, then (1) any consideration received by Plaintiff hereunder shall not be returned to Defendant but shall instead by credited toward the Award; (2) any release in favor of Defendant (including the release contained in Section 10 of this Agreement) shall be void; (3) Plaintiff shall have all remedies, whether at law, equity or otherwise, to enforce the Agreement or execute on the Award and related judgments.

13. **Successors.** This Agreement shall be binding on all Parties, as well as the respective Parties' personal representatives, agents, attorneys, heirs, assigns or successors in interest.

14. **Integration.** This Agreement constitutes the Parties' entire agreement with respect to the subject matter herein.

15. **Choice of Law.** This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania.

16. **Acknowledgment.** Each of the Parties hereto, by the execution hereof, acknowledges that it has had a fair and adequate opportunity to read and understand all of the provisions of this settlement agreement and has signed the same freely, willingly and with the specific intent of bringing all litigation involving the Parties to a permanent conclusion and releasing all others from any other claims each may have against the other as herein above specified.

17. **Authority.** The person executing this Agreement on behalf of each Party hereby warrants and represents (and acknowledges that each Party hereby warrants and represents such warranties and representations) that he or she has the full competency, power and authority to bind such entity in accordance with the terms of this Agreement, including, without limitation, any assignment hereunder, and that no further corporate or other action is required to make this agreement and any assignment hereunder valid and binding.

18. **Counterparts.** This Agreement may be signed in counterparts or any number of duplicate originals, each of which shall be deemed an original, but all of which together shall

constitute one and the same instrument. This Agreement shall not be deemed effective until signed by all the Parties hereto.

19. **Attorney's Fees.** Should it be necessary to enforce the terms of this Agreement, the Court shall award reasonable attorney's fees to the prevailing Party.

IN WITNESS WHEREOF, the Parties hereto, by their duly authorized representatives, do execute this Agreement the day and year first above written.

**PLAINTIFF:**
P&I Insurance Services, LLC

Signed by:
BY: Andrew Porter
5EFC8DDB5723406...
its Founder

**DEFENDANT:**

Donald Blizzard
Donald Blizzard
12/31/2024 05:03PM UTC

EXHIBIT A
Plaintiff Wire Instructions

[TO BE ADDED]

# First Bank NJ Wiring Instructions

P & I Insurance Services LLC

- Name of Bank: **First Bank NJ**
- Bank Address: **22 W State Street, Media, PA, 19063**
- Bank Routing Number: REDACTED REDACTED**7924**
- P&I Insurance Account Number: REDACTED**3247**

EXHIBIT B
Assignment of GIX Interest

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto

P & I INSURANCE SERVICES, LLC

One Hundred Thousand (100,000) Shareholder Units of Global Interxchange LLC, a New Jersey limited liability company (the "Company"), representing One Hundred Sixty Nine Thousandths of One Percent (0.169%) of the issued and outstanding membership interests in the Company, standing in the name of the undersigned on the books of the Company, and does hereby irrevocably constitute and appoint the Company's Manager, or its designee, to transfer said membership interest with full power of substitution.

Date: December _____, 2024 12/31/2024 05:03PM UTC

Donald Blizzard
_________________________________
Donald Blizzard

formstack sign

# Document Completion Certificate

Document Reference : 57669283-73f6-4487-8d6f-377b25600900
Document Title : settlement
Document Region : Northern Virginia
Sender Name : Don Blizzard
Sender Email : don@riskaverseinsurance.com
Total Document Pages : 12
Secondary Security : Not Required
Participants

1. Donald Blizzard (donblizz79@gmail.com)

## Document History

| Timestamp | Description |
|---|---|
| 12/31/2024 05:00PM UTC | Sender downloaded document. |
| 12/31/2024 05:02PM UTC | Document sent by Don Blizzard (don@riskaverseinsurance.com). |
| 12/31/2024 05:02PM UTC | Email sent to Donald Blizzard (donblizz79@gmail.com). |
| 12/31/2024 05:02PM UTC | Email sent to Don Blizzard (don@riskaverseinsurance.com). |
| 12/31/2024 05:03PM UTC | Document viewed by Donald Blizzard (donblizz79@gmail.com).<br>71.230.97.161<br>Mozilla/5.0 (iPhone; CPU iPhone OS 18_1_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/18.1.1 Mobile/15E148 Safari/604.1 |
| 12/31/2024 05:03PM UTC | Donald Blizzard (donblizz79@gmail.com) has agreed to terms of service and to do business electronically with Don Blizzard (don@riskaverseinsurance.com).<br>71.230.97.161<br>Mozilla/5.0 (iPhone; CPU iPhone OS 18_1_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/18.1.1 Mobile/15E148 Safari/604.1 |
| 12/31/2024 05:03PM UTC | Signed by Donald Blizzard (donblizz79@gmail.com).<br>71.230.97.161<br>Mozilla/5.0 (iPhone; CPU iPhone OS 18_1_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/18.1.1 Mobile/15E148 Safari/604.1 |
| 12/31/2024 05:03PM UTC | Document copy sent to Donald Blizzard (donblizz79@gmail.com). |
| 12/31/2024 05:03PM UTC | Document copy sent to Don Blizzard (don@riskaverseinsurance.com). |